IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs July 10, 2018

## STATE OF TENNESSEE v. JAMAAL AUSTIN

**Appeal from the Criminal Court for Shelby County**
**No. 15-06293     W. Mark Ward, Judge**

_____

### No. W2017-01632-CCA-R3-CD

_____

The Defendant, Jamaal Austin, was convicted by a jury of one count of first degree felony murder; one count of first degree premeditated murder; one count of especially aggravated robbery, a Class A felony; two counts of attempted aggravated robbery, a Class C felony; one count of aggravated burglary, a Class C felony; and one count of employment of a firearm during the commission of a dangerous felony, a Class C felony. See Tenn. Code Ann. §§ 39-12-101, -13-202, -13-402, -13-403, -14-403, -17-1324(b). The trial court then merged the first degree premeditated murder conviction into the first degree felony murder conviction. Following a sentencing hearing, the trial court imposed a total effective sentence of life imprisonment plus twenty-four years. On appeal, the Defendant contends (1) that the evidence was insufficient to sustain his convictions; (2) that the trial court erred in denying his severance motion; (3) that his convictions violate the constitutional prohibition against double jeopardy; (4) that the trial court failed to fulfill its duty as the thirteenth juror; and (5) that the trial court abused its discretion by imposing partial consecutive sentences.[1] Following our review, we conclude that the evidence was insufficient to sustain the Defendant's conviction for especially aggravated robbery. We vacate that conviction and modify it to aggravated robbery. The case is remanded to the trial court for a new sentencing hearing on the modified conviction, entry of an amended judgment form reflecting the modification, and entry of corrected judgment form in Count 1 reflecting the trial court's merger of the first degree premediated murder conviction into the first degree felony murder conviction. We affirm the judgments of the trial court in all other respects.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**
**in Part; Reversed in Part; Case Remanded**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which ALAN E. GLENN and CAMILLE R. MCMULLEN, JJ., joined.

_____

[1] For the sake of clarity, the issues have been reordered from how they appear in the Defendant's brief.

Terita Hewlett, Memphis, Tennessee, for the appellant, Jamaal Austin.

Herbert H. Slatery III, Attorney General and Reporter; Robert W. Wilson, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Douglas Gregory Gilbert and Jose Francisco Leon, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

## FACTUAL BACKGROUND

Aliayah Gamble testified that she was a student at Rust College where she met the Defendant. Ms. Gamble initially believed that the Defendant was also a student because "[h]e was on campus like the rest of" the students, but she eventually learned that he was not. On the morning of August 16, 2015, Ms. Gamble came to Memphis with her roommate. Ms. Gamble was not from Memphis. At some point that morning, Ms. Gamble called the Defendant, who was from Memphis, to get his help in locating a store.

Ms. Gamble and her roommate picked up the Defendant and the co-defendant, Dalvin Smith, who the Defendant introduced as "his cousin." Ms. Gamble dropped her roommate off to "get her hair braided." At that point, "the plan" was for Ms. Gamble and the defendants "[t]o go to [the Defendant's] mom's house." The Defendant directed Ms. Gamble to Prescott Place Apartments. Once they were inside the apartment complex, Ms. Gamble parked her car. The Defendant and co-defendant got out and walked "to the back of an apartment" while Ms. Gamble stayed in the car.

Ms. Gamble testified that she was "playing" on her cell phone while she waited on the defendants. Ms. Gamble estimated that the defendants were gone "for . . . like twenty minutes." At no point during that time did Ms. Gamble hear any gunshots. Ms. Gamble then saw the co-defendant "running to [her] car and panicking." The co-defendant got in the car and told Ms. Gamble "to pull off." Ms. Gamble dropped her phone and "put [the] car in reverse." Before she could drive away, the Defendant came running to the car with a gun in his hand. The Defendant got in the car and told Ms. Gamble to "[d]rive" because he "shot somebody." Ms. Gamble noticed that the co-defendant was crying.

Ms. Gamble testified that she hesitated because she "was kind of in shock" when the Defendant told her to drive. She "ended up switching positions [with the Defendant] and he started driving." By the time the Defendant started to drive, "other people from the apartment complex" had used their cars to block Ms. Gamble's car and "it looked like . . . [they would not be] getting out" of the complex.

-2-

Ms. Gamble heard the co-defendant ask for the gun and say to the Defendant, "You ain't going to do it like that, fam." The co-defendant then fired the gun "out of [the] window into the sky[,]" and the people blocking Ms. Gamble's car moved. Ms. Gamble believed that the Defendant "was going to try to run through the cars" that were blocking her car. Ms. Gamble thought that the co-defendant's statement, "You ain't going to do it like that, fam," was his way of telling the Defendant that he "shouldn't do it."

Ms. Gamble took the defendants "back to the house that [she] originally picked them up" at. The Defendant told Ms. Gamble that "it [was] going to be okay" and not to tell anyone about what had happened. Ms. Gamble picked up her roommate and told her about the incident at the apartment complex. Ms. Gamble's roommate urged her to go to the police. Ms. Gamble reported the incident to the police and was able to identify the Defendant and the co-defendant from separate photographic lineups.

Eladio Elias Salas testified at trial with the assistance of an interpreter. Mr. Salas lived at the Prescott Place Apartments with Hilvar Giovanny Lopez, Elmar Perez, and Mr. Perez's brother. On the morning of August 16, 2015, Mr. Salas and Mr. Lopez had left their apartment "to get some food" from a nearby store. As they walked up the stairs to return to their apartment, Mr. Salas "heard somebody running behind" them. Mr. Salas turned around and saw "two black males" coming toward them.

According to Mr. Salas, one of the men "was thin and tall and the other one [was] short and chubby." Mr. Salas identified the Defendant as the thin, tall man and the co-defendant as the short, chubby man. Mr. Salas admitted that he initially told the police that the Defendant had "a Mohawk." However, Mr. Salas explained that the Defendant had dreadlocks and that he had only used the word "Mohawk" because he did not know how to describe dreadlocks at the time of his statement.

Mr. Salas and Mr. Lopez went into their apartment. Mr. Salas attempted to close the door, but the Defendant "pushed the door open" and entered the apartment without his consent. Mr. Salas testified that the Defendant "pulled up a gun[,] . . . demanded money[,] and told [them] not to move." The Defendant pointed the gun at the victims when he demanded their money. Mr. Salas did not give the Defendant any money. Mr. Salas saw Mr. Lopez with "some money" in his hand, and he believed Mr. Lopez "gave the money to" the Defendant. Mr. Salas admitted that he did not see Mr. Lopez give the money to the Defendant, but he believed that the Defendant took the money because he "did not see any money thrown on the floor" after the incident.

Mr. Salas testified that the co-defendant "remained outside the door of the apartment." At some point, the co-defendant "grabbed" him and pulled him out of the apartment. Mr. Salas recalled that the co-defendant told him not to move. The

co-defendant then "grabbed a tire" from a stack of tires near the apartment door and "tried to hit [Mr. Salas] with [it]." Mr. Salas did not see the co-defendant with a gun. Mr. Salas insisted that he did not fight with defendants during the incident.

According to Mr. Salas, the two men left together. The Defendant continued to point the gun at Mr. Salas as he went down the stairs. Mr. Salas was "crouched down" by the door to the apartment. Mr. Lopez came outside to check on Mr. Salas because he "was worried about" Mr. Salas. As Mr. Salas was standing up, he heard a gunshot. Mr. Salas saw "a lot of blood coming out from [Mr. Lopez's] face and at that moment, [Mr. Lopez] fell on the ground." The Defendant and co-defendant fled. Mr. Salas testified that he was "screaming, asking for help" and that he eventually chased after the defendants. Mr. Salas saw them get in "a small white car" and leave the apartment complex.

Mr. Perez also testified at trial with the assistance of an interpreter. On the morning of August 16, 2015, Mr. Perez was "washing dishes" in the apartment's kitchen, and his brother "was sleeping in his bedroom." Mr. Perez recalled that Mr. Salas and Mr. Lopez had left the apartment "to buy food" and that when they returned, "two people were chasing them." Mr. Perez identified the Defendant as the man who came inside the apartment and "threatened [them] with a gun." The Defendant "was demanding money." Mr. Perez testified that he did not give the Defendant any money, but he thought Mr. Lopez "gave him money."

When the Defendant and the co-defendant left, Mr. Perez went outside the apartment. Mr. Perez saw the Defendant on the steps. Mr. Perez testified that the Defendant "raised the weapon and [then he] heard a gunshot." Mr. Perez saw Mr. Lopez fall "down the stairs" after being shot in the head. The defendants then ran away. Mr. Perez testified that he only saw one gun during the incident.

Investigators found a .40 caliber Smith & Wesson cartridge casing on the ground near the steps leading to the victims' apartment. Two more .40 caliber Smith & Wesson cartridge casings were found in the area of the parking lot where Ms. Gamble's car had been parked.

The co-defendant came to the police station "late" on the night of August 16, 2015, and said that "he needed to talk to" the investigators. The co-defendant was asked "where the weapon might be found[,]" and he responded that it was at "Wop's house" on South Highland Street. The owner of the South Highland Street house consented to a search and a .40 caliber Taurus handgun was found in a hallway closet. The gun was loaded with .40 caliber Smith & Wesson ammunition.

-4-

Doctor Karen Chancellor, an expert in forensic pathology, testified that she performed an autopsy on Mr. Lopez's body on August 17, 2015. Mr. Lopez suffered a gunshot wound to his "left eyebrow." The bullet caused "a collapse of the eye," "went through the left frontal cortex, . . . [went through] the left temporal cortex[,] and then it went through the cerebellum." The bullet fractured as it traveled through Mr. Lopez's brain. Dr. Chancellor was able to recover the bullet fragments from Mr. Lopez's brain. Dr. Chancellor opined that the gun was anywhere "from a few inches" to two feet away from Mr. Lopez when it was fired based on the "powder stippling" around the wound.

Subsequent forensic testing by the Tennessee Bureau of Investigation revealed that the three shell casings recovered from the Prescott Place Apartments and the bullet fragments recovered from Mr. Lopez's brain were all fired from the .40 caliber Taurus found at the South Highland Street house.

Venzel Holloway testified on behalf of the Defendant. Mr. Holloway testified that he had been a resident of the Prescott Place Apartments. On August 16, 2015, Mr. Holloway saw "two guys running up the steps" to an apartment. One of the men had dreadlocks and went inside the apartment for three or four minutes. The other man stayed outside the apartment.

According to Mr. Holloway, the man with dreadlocks left the apartment and was going down the steps when three Hispanic men came out of the apartment and started "grabbing" him. Mr. Holloway testified that the man who had waited outside the apartment hit one of the Hispanic men with a tire. Mr. Holloway claimed that all of the men were "tussling" when "a gun came out." Mr. Holloway then "heard a gunshot," and "everybody just scattered."

Mr. Holloway admitted that since the incident he had "been hospitalized," "had seizures," and took medication "[e]very day." Mr. Holloway also admitted that he was reluctant to testify because he "didn't really remember" what happened.

Based upon the foregoing, the jury convicted the Defendant of first degree felony murder, first degree premeditated murder, especially aggravated robbery, two counts of attempted aggravated robbery, aggravated burglary, and employment of a firearm during the commission of a dangerous felony. After the verdicts were announced and the jury was excused, the Defendant exclaimed, "All of y'all can suck my d--k. F--k the [j]udge, the jurors, the prosecutors, f--k all of you. Y'all can suck my d--k." The Defendant was removed from the courtroom. The trial court then "approve[d] [the] verdicts" as the

thirteenth juror. The trial court subsequently merged the Defendant's conviction for first degree premeditated murder into his conviction for first degree felony murder.[2]

## ANALYSIS

### I. Sufficiency of the Evidence

The Defendant contends that the evidence was insufficient to sustain his convictions "for the offenses charged." Specifically, the Defendant argues that there was no evidence of premeditation with respect to his first degree premeditated murder conviction. The Defendant also argues that the evidence was insufficient to sustain his convictions for first degree felony murder, especially aggravated robbery, and the two counts of attempted aggravated robbery because "there was no testimony" that the Defendant "actually took any money or property from the apartment or victim." The State concedes that the evidence was insufficient to sustain the Defendant's conviction for especially aggravated robbery but for reasons different than those argued by the Defendant. The State responds that the evidence was sufficient to sustain all of the Defendant's remaining convictions.

### A. Standard of Review

An appellate court's standard of review when the defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). This court does not reweigh the evidence, rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Bland, 958 S.W.2d at 659; State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). A guilty verdict "may not be based solely upon conjecture, guess, speculation, or a mere possibility." State v. Cooper, 736 S.W.2d 125, 129 (Tenn. Crim. App. 1987). However, "[t]here is no requirement that the State's

---

[2] The judgment form for the first degree felony murder conviction erroneously stated that the conviction was "[m]erged into Count 2 by law." The judgment form for the first degree premeditated murder conviction correctly stated that it was "[m]erged into Count 1 by law." On remand, the trial court is to enter a corrected judgment form for Count 1 reflecting that Count 2 was the merged conviction.

proof be uncontroverted or perfect." State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). Put another way, the State is not burdened with "an affirmative duty to rule out every hypothesis except that of guilt beyond a reasonable doubt." Jackson, 443 U.S. at 326.

The foregoing standard "applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of [both] direct and circumstantial evidence." State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). Both "direct and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." State v. Dorantes, 331 S.W.3d 370, 381 (Tenn. 2011). The duty of this court "on appeal of a conviction is not to contemplate all plausible inferences in the [d]efendant's favor, but to draw all reasonable inferences from the evidence in favor of the State." State v. Sisk, 343 S.W.3d 60, 67 (Tenn. 2011).

### B. First Degree Premeditated Murder

Premeditated first degree murder is defined as "[a] premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1). A person acts intentionally "when it is the person's conscious objective or desire to engage in the conduct or cause the result." Tenn. Code Ann. § 39-11-302(a).

> Premeditation is an act done after the exercise of reflection and judgment. Premeditation means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time.

Tenn. Code Ann. § 39-13-202(d) (internal quotations omitted).

The element of premeditation only requires the defendant to think "about a proposed killing before engaging in the homicidal conduct." State v. Brown, 836 S.W.2d 530, 541 (Tenn. 1992). The presence of premeditation is a question for the jury and may be established by proof of the circumstances surrounding the killing. Bland, 958 S.W.2d at 660. Our supreme court has held that factors determining the existence of premeditation include, but are not limited to, the following: the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, declarations by the defendant of an intent to kill, evidence of procurement of a weapon, preparations before the killing for concealment of the crime, destruction or secretion of evidence of the killing, and calmness immediately after the killing. See State v. Davidson, 121 S.W.3d 600, 614 (Tenn. 2003); Bland, 958 S.W.2d at 660. Additional factors cited by this court from which a jury may infer premeditation include the lack of provocation by the victim and the defendant's failure to render aid to the victim. See State v. Lewis, 36 S.W.3d 88, 96 (Tenn. Crim. App. 2000).

-7-

After forcing himself into the victims' apartment and demanding money, the Defendant shot Mr. Lopez in the head from a short distance away. The victims were unarmed, and Mr. Lopez had gone outside to check on Mr. Salas because he "was worried about" Mr. Salas. The co-defendant was crying upon returning to Ms. Gamble's car, but the Defendant stated that he had "shot somebody" and instructed Ms. Gamble to drive. When Ms. Gamble hesitated out of shock, the Defendant switched places with her and started to drive. At one point, Ms. Gamble believed that the Defendant "was going to try to run through the cars" that were blocking them. The Defendant told Ms. Gamble "it [was] going to be okay" and to not tell anyone about what had happened. The gun was then hidden at a house on South Highland Street.

The foregoing was sufficient to establish that the killing of Mr. Lopez was premeditated. The Defendant argues that the testimony at trial was "conflicting" and that Mr. Lopez was killed after "a fight" with the victims. Mr. Holloway testified that he saw three Hispanic men "tussling" with a man with dreadlocks prior to the shooting. However, Mr. Salas insisted that he did not fight the defendants during the incident, and Mr. Salas and Mr. Perez both testified that the Defendant was on the steps leading away from the apartment when he shot Mr. Lopez. It was within the province of the jury to accredit the testimony of Mr. Salas and Mr. Perez over that of Mr. Holloway, and we will not disturb that determination on appeal. See Bland, 958 S.W.2d at 659. Accordingly, we conclude that the evidence was sufficient to sustain the Defendant's conviction for first degree premeditated murder.

### C. First Degree Felony Murder

As pertinent to our review, first degree felony murder is the "killing of another committed in the perpetration or attempt to perpetrate . . . [a] robbery[.]" Tenn. Code Ann. § 39-13-202(a)(2). "No culpable mental state is required for conviction" of first degree felony murder, "except the intent to commit the enumerated" offense. Tenn. Code Ann. § 39-13-202(b). Robbery "is the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Tenn. Code Ann. § 39-13-401(a).

"The felony murder rule applies when the killing is 'done in pursuance of the unlawful act, and not collateral to it.'" State v. Thacker, 164 S.W.3d 208, 223 (Tenn. 2005) (quoting Farmer v. State, 296 S.W.2d 879, 883 (Tenn. 1956)). Nonetheless, "[t]he killing may precede, coincide with, or follow the felony and still be considered as occurring 'in the perpetration of' the felony offense, so long as there is a connection in time, place, and continuity of action." Id. (internal quotation marks omitted) (quoting State v. Buggs, 995 S.W.2d 102, 106 (Tenn. 1999)). The jury "may reasonably infer from a defendant's actions immediately after a killing that the defendant had the intent to

commit the felony prior to, or concurrent with, the killing." Id. (internal quotation marks omitted) (quoting Buggs, 995 S.W.2d at 106).

The Defendant argues that the evidence was insufficient to sustain his conviction for first degree felony murder because there "was no evidence to suggest that . . . [he] committed aggravated robbery." At a minimum, the evidence clearly established that the Defendant killed Mr. Lopez during the attempt to perpetrate a robbery. The Defendant entered the victims' apartment, pointed a gun at them, and demanded money from them. Mr. Salas and Mr. Perez both believed that Mr. Lopez gave money to the Defendant. Mr. Salas testified that the Defendant continued to point the gun at him as the Defendant went down the stairs. Mr. Lopez was shot as he came outside to check on Mr. Salas. The Defendant and the co-defendant then fled from the apartment complex. The killing of Mr. Lopez was connected in time, place, and continuity of action to the Defendant's attempt to rob the victims. Accordingly, we conclude that the evidence was sufficient to sustain the Defendant's conviction for first degree felony murder.

### D. Especially Aggravated Burglary

Especially aggravated robbery is a robbery "[a]ccomplished with a deadly weapon" and "[w]here the victim suffers serious bodily injury." Tenn. Code Ann. § 39-13-403(a). As stated above, a robbery is "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Tenn. Code Ann. § 39-13-401(a). Theft of property occurs when, "with the intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." Tenn. Code Ann. § 39-14-103(a).

The Defendant contends that the State failed to prove that he took any property from the victims. Both Mr. Salas and Mr. Perez testified that they did not give anything to the Defendant when he demanded money. However, Mr. Salas testified that he saw "some money" in Mr. Lopez's hand. Mr. Salas admitted that he did not see Mr. Lopez give the money to the Defendant, but he believed that the Defendant had taken the money because he "did not see any money thrown on the floor" after the incident. Mr. Perez likewise believed that Mr. Lopez "gave [the Defendant] money."

The State was not required to present uncontroverted or perfect proof that the Defendant took Mr. Lopez's money. See Williams, 657 S.W.2d at 410. The fact that the Defendant took Mr. Lopez's money was a reasonable inference for the jury to draw from Mr. Salas's testimony that he saw money in Mr. Lopez's hand and that the money was gone after the Defendant left the apartment. As such, the evidence was sufficient to establish that the Defendant took Mr. Lopez's property.

This conclusion does not end our analysis. While not raised in the Defendant's brief, our supreme court has recently held that "the victim of an especially aggravated robbery must suffer his or her serious bodily injury during the commission of the underlying theft, i.e., before the accused has completed the theft of property." State v. Henderson, 531 S.W.3d 687, 694 (Tenn. 2017). Here, Mr. Lopez was shot after the Defendant completed the underlying theft of Mr. Lopez's property. Accordingly, we concluded that the evidence was insufficient to sustain the Defendant's conviction for especially aggravated robbery.

However, the evidence at trial was sufficient to sustain a conviction for aggravated robbery, the first lesser-included offense that was charged to the jury. See Tenn. Code Ann. § 39-13-402(a)(1) (providing that aggravated robbery is a robbery "[a]ccomplished with a deadly weapon"). Accordingly, we modify the Defendant's especially aggravated robbery conviction to aggravated robbery. The case is remanded to the trial court for a new sentencing hearing on the modified conviction and entry of an amended judgment form reflecting the modification. See State v. Harold Allen Vaughn, No. W2016-00131-CCA-R3-CD, 2018 WL 1597421, at *5 (Tenn. Crim. App. Mar. 29, 2018) (following the same procedure in light of our supreme court's holding in Henderson).

### E. Attempted Aggravated Robbery

As pertinent to our review, aggravated robbery is a robbery "[a]ccomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon[.]" Tenn. Code Ann. § 39-13-402(a)(1). Also pertinent to our review, criminal attempt is committed when a defendant acts "with the kind of culpability otherwise required for the offense" and "with [the] intent to cause a result that is an element of the offense," and the defendant "believes the conduct will cause the result without further conduct on the [defendant's] part." Tenn. Code Ann. § 39-12-101(a)(2).

The Defendant was charged with attempted aggravated robbery with respect to Mr. Salas and Mr. Perez. The Defendant argues on appeal that the evidence was insufficient to prove attempted aggravated robbery because there was no proof that "anything was taken during [the] incident." Criminal attempt is an inchoate offense and, "by nature, is a failure to accomplish what one intended to do." State v. Kimbrough, 924 S.W.2d 888, 890 (Tenn. 1996) (internal quotation marks omitted) (quoting Keys v. State, 766 P.2d 270, 273 (Nev. 1988)).

Whether the Defendant succeeded in taking property from Mr. Lopez is of no consequence in determining if he committed attempted aggravated robbery with respect to Mr. Salas and Mr. Perez. The act "of demanding money while pointing a gun at [the victims was] sufficient to convict [the Defendant] of attempted aggravated robbery."

State v. Christopher Terrell Shipp, No. M2016-01397-CCA-R3-CD, 2017 WL 4457595, at *4 (Tenn. Crim. App. Oct. 5, 2017) (citing similar cases), perm. app. denied (Tenn. Feb. 14, 2018). Accordingly, we conclude that the evidence was sufficient to sustain the Defendant's convictions for attempted aggravated robbery.

## F. Aggravated Burglary

Aggravated burglary is the "burglary of a habitation[.]" Tenn. Code Ann. § 39-14-403(a). Burglary is committed when a person, "without the effective consent of the property owner," "[e]nters a building . . . with [the] intent to commit a felony, theft[,] or assault[.]" Tenn. Code Ann. § 39-14-402(a)(1). A habitation is defined as "any structure . . . which is designed or adapted for the overnight accommodation of persons[.]" Tenn. Code Ann. § 39-14-401(1)(A). Here, the evidence established that the Defendant entered the victims' apartment without their consent with the intent to commit a theft. Accordingly, the evidence was sufficient to sustain the Defendant's conviction for aggravated burglary.

## G. Employment of a Firearm

It is an offense "to employ a firearm during the . . . [c]omission of a dangerous felony" or "[a]ttempt to commit a dangerous felony." Tenn. Code Ann. § 39-17-1324(b)(1)-(2). Aggravated burglary is one of the enumerated dangerous felonies. Tenn. Code Ann. § 39-17-1324(i)(1)(H). The Defendant was charged with employment of a firearm during the aggravated burglary or attempted aggravated burglary of the victims' apartment. The evidence established that the Defendant entered the victims' apartment armed with a handgun and that he pointed the gun at the victims while demanding money. Accordingly, we conclude that the evidence was sufficient to sustain the Defendant's conviction for employment of a firearm during the commission of a dangerous felony.

## II. Severance

The Defendant contends that the trial court erred in denying his motion to sever his trial from the co-defendant's. The Defendant argues that denial of the severance motion allowed the State to present out-of-court statements by the non-testifying co-defendant that implicated the Defendant in violation of Bruton v. United States, 391 U.S. 123 (1968). Specifically, the Defendant challenges instances when Ms. Gamble testified that the co-defendant told her that the Defendant had shot someone and an investigator testified that the co-defendant told him that "they" took the handgun to the house on South Highland Street. The State responds that the trial court did not abuse its discretion in denying the Defendant's severance motion.

-11-

Prior to trial, the Defendant filed a motion pursuant to Tennessee Rule of Criminal Procedure 14(c)(1) to sever his trial from the co-defendant's. At the pretrial hearing on the severance motion, the State asserted that it did "not intend to introduce [the codefendant's] statement" at trial. The State explained that it planned to ask one of the investigators if the co-defendant told him the location of the gun, "[b]ut no pronouns" would be used during the questioning. The trial court denied the severance motion because the State did not intend "to introduce that statement and . . . [would] take out any reference to" the Defendant.

During the State's direct examination of Ms. Gamble, the prosecutor requested a jury-out hearing. The prosecutor stated that he "had forgotten" that when the co-defendant returned to Ms. Gamble's car, the co-defendant said, "Pull off, [the Defendant] just shot somebody in the face." The prosecutor requested that the trial court allow him to ask Ms. Gamble about that statement. The Defendant objected. The trial court denied the State's request and instructed the prosecutor not to ask Ms. Gamble about the co-defendant's statement that the Defendant had "just shot somebody in the face." When the jury returned, Ms. Gamble was asked about what the co-defendant told her to do and she responded that he "told [her] to pull off." Ms. Gamble was not asked about the co-defendant's statement that the Defendant had "just shot somebody in the face."

Later during the State's direct examination, Ms. Gamble was asked about a statement she wrote on a photographic lineup that the Defendant "shot the gun." Ms. Gamble admitted that she did not see the Defendant shoot anyone and was asked why she thought the Defendant had shot someone. Ms. Gamble responded, "Because that's what [the co-defendant] said." The Defendant requested a bench conference and objected. The trial court instructed the prosecutor to "clear that up a little bit." The prosecutor then asked, "Ms. Gamble, did you mean to say that [the Defendant] said he shot someone that day?" Ms. Gamble responded, "Yes."

During the testimony of one of the investigators, the prosecutor asked the investigator if the co-defendant had "given [him] an indication of where the weapon might be found?" The investigator responded that the co-defendant "said that they had taken it from the scene to" the South Highland Street house. Just prior to being asked this, the investigator had testified that the co-defendant's statement was consistent "[a]s far as being [at the crime scene] and who he was with." The Defendant objected to the investigator's use of the pronoun "they." The trial court instructed the jury to disregard the question and the investigator's answer.

The trial court then held a jury-out hearing and asked the investigator if the prosecutor had "cautioned" him about using "plural pronouns," and the investigator answered that the prosecutor had done so. The trial court instructed the investigator not

to use "plural pronouns." The jury returned, and the prosecutor asked the investigator if the co-defendant had indicated "where the gun used in this incident could be located." The investigator responded, "Yes, sir . . . [a]t Wop's house."

The admission of a co-defendant's statement that implicates a defendant when the co-defendant does not testify at trial violates a defendant's constitutional right to confrontation. Bruton, 391 U.S. at 126. In an attempt to address this issue, Tennessee Rule of Criminal Procedure 14(c)(1) provides that a defendant may "move for a severance because an out-of-court statement of a co[-]defendant makes reference to the defendant but is not admissible against the defendant." When a defendant makes such a motion, the trial court "shall determine whether the [S]tate intends to offer the statement in evidence at trial." Tenn. R. Crim. P. 14(c)(1). If the State intends to introduce the statement, the trial court "shall require the prosecuting attorney to elect" either a joint trial without the statement, a joint trial at which the statement is admitted "only after all references to the moving defendant have been deleted and if the redacted confession will not prejudice the moving defendant," or a severance of the moving defendant. Tenn. R. Crim. P. 14(c)(1)(A)-(C).

We review a trial court's decision regarding a severance motion for an abuse of discretion. State v. Maddox, 957 S.W.2d 547, 556 (Tenn. Crim. App. 1997). "An abuse of discretion occurs when the trial court (1) applies an incorrect legal standard, (2) reaches an illogical or unreasonable decision, or (3) bases its decision on a clearly erroneous assessment of the evidence." State v. Mangrum, 403 S.W.3d 152, 166 (Tenn. 2013) (citing Lee Med., Inc. v. Beecher, 312 S.W.3d 515, 524 (Tenn. 2010)). With respect to a trial court's denial of a motion to sever co-defendants, the record must demonstrate that the moving defendant was prejudiced "to the point that the trial court's discretion ended and the granting of [a] severance became a judicial duty." Maddox, 957 S.W.2d at 556 (alteration in original) (internal quotation marks omitted) (quoting State v. Burton, 751 S.W.2d 440, 447 (Tenn. Crim. App. 1988)).

Here, the trial court denied the Defendant's motion prior to trial because the State asserted that it did not intend to introduce the statement at trial except to ask about the location of the gun. The State further asserted that it would ask about the location of the gun without reference to any pronouns. During trial, the co-defendant's statement to Ms. Gamble that the Defendant had "just shot somebody in the face" became an issue. However, the trial court denied the State's request to question Ms. Gamble about that statement, and she was never asked about it.

Later, Ms. Gamble was asked why she thought the Defendant had shot someone when she did not see him do it, and she mistakenly responded that it was because "that's what [the co-defendant] said." The trial court instructed the prosecutor to "clear that up a little bit," and Ms. Gamble testified that she meant to say it was because the Defendant

-13-

"said he shot someone that day." Based on the foregoing, we conclude that Ms. Gamble's testimony did not rise to the level of a <u>Bruton</u> violation.

Regarding the investigator's use of the pronoun "they," "a <u>Bruton</u> issue can be avoided by the use of a neutral pronoun in place of the complaining defendant's name." <u>State v. Alberto Conde-Valentino</u>, No. M2015-01872-CCA-R3-CD, 2016 WL 5799794, at *8 (Tenn. Crim. App. Oct. 4, 2016). "They" can serve as such a neutral pronoun so long as it does not clearly identify or directly implicate the defendant. <u>See</u> <u>Thomas v. State</u>, 796 S.E.2d 242, 248 (Ga. 2017). In this case, the investigator's use of the pronoun "they" was not neutral given that there were only two defendants and the investigator had previously testified that the co-defendant's statement was consistent "[a]s far as being [at the crime scene] and who he was with." As such, the trial court was correct to instruct the jury to disregard the question and the investigator's answer.

Moreover, "the mere finding of a <u>Bruton</u> error in the course of [a] trial 'does not automatically require reversal of the ensuing criminal conviction.'" <u>King v. State</u>, 989 S.W.2d 319, 329 (Tenn. 1999) (quoting <u>Schneble v. Florida</u>, 405 U.S. 427, 430 (1972)). "In cases where the properly admitted evidence of guilt is overwhelming, and the prejudicial effect of the co[-]defendant's confession is insignificant by comparison, then the improper admission is harmless beyond a reasonable doubt." <u>Id.</u> Here, the investigator's use of the pronoun "they" was insignificant in light of the overwhelming proof of the Defendant's guilt and the trial court's instruction to the jury to disregard the investigator's answer. Accordingly, we conclude that any <u>Bruton</u> violation in the investigator's use of the pronoun "they" was harmless beyond a reasonable doubt. As such, the trial court did not abuse its discretion in denying the Defendant's severance motion.

### III. Double Jeopardy

The Defendant contends that his convictions violate the constitutional prohibition against double jeopardy. The Defendant argues that his convictions violate double jeopardy because they stem "from one criminal episode." The Defendant also argues that his employment of a firearm during the commission of a dangerous felony conviction specifically "violates the principle of double jeopardy" because "several of the offenses [he was charged with] include[d] the essential element" of employing a firearm. The State responds that the Defendant's convictions do not violate the constitutional prohibition against double jeopardy.

Both the United States and Tennessee Constitutions protect against a criminal defendant being placed in double jeopardy for the same offense. U.S. Const. amend. V; Tenn. Const. art. I, § 10. This protection includes: "(1) protection against a second prosecution for the same offense after acquittal; (2) protection against a second

-14-

prosecution for the same offense after conviction; and (3) protection against multiple punishments for the same offense." State v. Watkins, 362 S.W.3d 530, 541 (Tenn. 2012). At issue here is the last of these protections, protection against multiple punishments for the same offense, specifically a "multiple description claim."

Multiple description claims "arise in cases in which defendants who have been convicted of multiple criminal offenses under different statutes allege that the convictions violate double jeopardy because the statutes punish the 'same offense.'" Watkins, 362 S.W.3d at 544. As such, we are tasked with determining whether the Defendant committed multiple offenses or only one. Id. In doing so, we apply the test announced in Blockburger v. United States, 284 U.S. 299 (1932). Id. at 556 (adopting the Blockburger test).

The Blockburger test applies "where the same act or transaction constitutes a violation of two distinct statutory provisions" and requires examination of "whether each provision requires proof of a fact which the other does not." 284 U.S. at 304. Put another way, "[i]f each offense includes an element that the other offense does not, 'the Blockburger test is satisfied, notwithstanding a substantial overlap in the proof offered to establish the crimes.'" Watkins, 362 S.W.3d at 544 (quoting Iannelli v. United States, 420 U.S. 770, 785 n.17 (1975)).

"The Blockburger test involves a two-step process": (1) "the threshold inquiry . . . is whether the alleged statutory violations arise from 'the same act or transaction'"; and (2) if they do, "a court next examines the statutes to determine whether the crimes of which the defendant was convicted constitute the same offense." Watkins, 362 S.W.3d at 545. If each statutory offense "includes an element not contained in the other, the offenses are distinct," and "the legislature is presumed to have intended to allow the offenses to be punished separately." Id. at 545-46. The question of whether multiple convictions violate double jeopardy is one of mixed law and fact, "which we review de novo without any presumption of correctness." Id. at 539.

The bulk of the Defendant's convictions failed to meet the threshold inquiry of the Blockburger test. "If a defendant's multiple convictions arise under different statutes and are based on discrete acts or involve multiple victims, then the double jeopardy protection against multiple punishment is not implicated." Watkins, 362 S.W.3d at 554. Here, the Defendant was convicted of first degree felony murder for the killing of Mr. Lopez, the aggravated robbery of Mr. Lopez,[3] the attempted aggravated robberies of Mr. Salas and Mr. Perez, the aggravated burglary of the victims' apartment, and the employment of a firearm during the commission of the aggravated burglary. The Defendant's convictions for first degree felony murder, aggravated robbery, and attempted aggravated robbery

---

[3] As that conviction was modified earlier in this opinion.

-15-

were all based on discrete acts or involved multiple victims; therefore, they did not satisfy the threshold inquiry of the Blockburger test.

Additionally, this court has previously held that separate convictions for aggravated robbery and aggravated burglary do not violate the prohibition against double jeopardy because the offenses "are narrowly defined by statute and each contains different elements." State v. Branham, 501 S.W.3d 577, 593 (Tenn. Crim. App. 2016) (internal quotation marks omitted) (quoting State v. Larry Jereller Alston, No. E2012-00431-CCA-R3-CD, 2013 WL 2382589, at *10 (Tenn. Crim. App. May 30, 2013), aff'd on other grounds, 465 S.W.3d 555 (Tenn. 2015)). Accordingly, double jeopardy did not bar the Defendant's conviction for aggravated burglary along with his convictions for aggravated robbery and attempted aggravated robbery.

With respect to the employment of a firearm and aggravated burglary convictions, we note that "a person may not be charged with" employment of a firearm during the commission of a dangerous felony if "employing a firearm is an essential element of the underlying dangerous felony as charged." Tenn. Code Ann. § 39-17-1324(c) (emphasis added). Similarly, "[a] court applying the Blockburger test must examine the elements of the charged offenses in the abstract, as they are stated in the pertinent statutes, without regard to the specific facts in a given case." State v. Martin, 505 S.W.3d 492, 510-11 (Tenn. 2016).

The Defendant was charged with employing a firearm during the commission of an aggravated burglary. This court has previously held that "[t]he use of a firearm is not an essential element of an aggravated burglary." State v. Walter H. Webb, No. M2014-01929-CCA-R3-CD, 2015 WL 8519525, at *8 (Tenn. Crim. App. Dec. 11, 2015), perm. app. dismissed (Tenn. Apr. 4, 2017). The fact that "several of the [other] offenses [the Defendant was charged with] include[d] the essential element" of employing a firearm is of no consequence when we examine the offenses as charged and in the abstract. Likewise, "[t]hat a firearm may have been used by [the] Defendant as part of his intent to commit [a theft] does not transform the use of the firearm into an essential element of the aggravated burglary." Id. Accordingly, the Defendant's conviction for employment of a firearm during the commission of a dangerous felony did not violate his double jeopardy protections.

### IV. Thirteenth Juror

The Defendant contends that the trial court failed to fulfill its duty as the thirteenth juror. The Defendant argues that the trial court should have rejected the jury's verdicts because they were "contrary to the evidence and the law." The State responds that the trial court fulfilled its duty as the thirteenth juror when it stated that it approved the jury's verdicts.

-16-

Tennessee Rule of Criminal Procedure 33(d) provides that "[t]he trial court may grant a new trial following a verdict of guilty if it disagrees with the jury about the weight of the evidence." This is the modern equivalent of the thirteenth juror rule and "imposes upon a trial court judge the mandatory duty to serve as the thirteenth juror in every criminal case, and that approval by the trial judge of the jury's verdict as the thirteenth juror is a necessary prerequisite to imposition of a valid judgment." State v. Biggs, 218 S.W.3d 643, 653 (Tenn. Crim. App. 2006) (internal quotation marks omitted) (quoting State v. Carter, 896 S.W.2d 119, 122 (Tenn. 1995)).

It is only when "the record contains statements by the trial judge expressing dissatisfaction with the weight of the evidence of the jury's verdict, or [evidence] indicating that the trial court absolved itself of its responsibility to act as the thirteenth juror, [that] an appellate court may reverse the trial court's judgment" on the basis that the trial court failed to carry out its duty as the thirteenth juror. Carter, 896 S.W.2d at 122. "[T]he accuracy of a trial court's thirteenth juror determination is not a subject of appellate review." State v. Moats, 906 S.W.2d 431, 435 (Tenn. 1995).

Here, the record is clear that the trial court fulfilled its duty as the thirteenth juror. The trial court expressly stated at the conclusion of the Defendant's trial that it "approve[d] [the] verdicts" as the thirteenth juror. Additionally, the trial court denied the Defendant's motion for new trial. See Biggs, 218 S.W.3d at 653 (providing that we "may presume the trial court approved the verdict as the thirteenth juror" when it has overruled a motion for new trial without comment). The Defendant's thirteenth juror claim is merely an attack on the sufficiency of the convicting evidence. A claim that the trial court failed to fulfill its duty as the thirteenth juror "is not a proper vehicle to challenge the sufficiency of the convicting evidence." State v. Leath, 461 S.W.3d 73, 115 (Tenn. Crim. App. 2013). Accordingly, we conclude that this issue is without merit.

## V. Consecutive Sentencing

The Defendant contends that the trial court abused its discretion by imposing partial consecutive sentences. The Defendant argues that the trial court failed to make the necessary factual findings. The Defendant also argues that consecutive sentencing was not appropriate because "[a]ll of the offenses charged . . . arose out of one set of circumstances." The State responds that the trial court did not abuse its discretion in imposing partial consecutive sentences.

At the Defendant's sentencing hearing, the presentence report reflected that the Defendant, who was twenty years old at the time of the hearing, had been adjudicated delinquent as a juvenile for attempted robbery and "felony theft." The Defendant also stated in the report that he had "a long history of using illegal drugs" and was affiliated with a gang.

-17-

The Defendant testified and apologized for his outburst during the conclusion of his trial. The Defendant stated that he had been diagnosed with "[b]ipolar, ADHD, and anxiety." The Defendant admitted that he had a long history of illegal drug use. The Defendant also admitted that he had been a member of the "King Gate Mafia" gang for "about seven years."

The Defendant claimed that he "didn't do anything" on the day of the robbery and murder. The Defendant admitted that he was at the Prescott Place Apartments but claimed that he was by himself and "visiting" a friend who lived in the apartment complex. The Defendant explained that he sold "cocaine and heroin" and was at the apartment complex "making a serve." However, the Defendant claimed that he was not getting paid for the drugs. According to the Defendant, he was "selling drugs for somebody else" "for the heck of it."

The Defendant received a life sentence for his first degree felony murder conviction. The trial court imposed a twenty year sentence for the especially aggravated robbery conviction and six-year sentences for the remaining convictions of attempted aggravated robbery, aggravated burglary, and employment of a firearm during the commission of a dangerous felony.

The trial court concluded that the Defendant was a dangerous offender whose behavior indicated little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high. See Tenn. Code Ann. § 40-35-115(b)(4). In doing so, the trial court found that consecutive sentencing was reasonably related to the severity of the offenses committed given that "this [was] a premeditated act involving a home invasion and a senseless shooting and killing." The trial court placed great importance on the fact that the Defendant had violated "the sanctity of the [victims'] home."

The trial court also found that consecutive sentencing was necessary to protect the public from further criminal conduct by the Defendant. The trial court noted that there had been "multiple efforts to rehabilitate the [D]efendant as a juvenile, his long history of being a drug dealer, his history of being in a gang . . . it all adds up." The trial court ordered the Defendant's convictions for aggravated burglary, two counts of attempted aggravated robbery, and employment of a firearm during the commission of a dangerous felony to be served consecutively to each other and to his life sentence for first degree murder. The trial court ordered the Defendant's sentence for especially aggravated robbery to be served concurrently with all of the other sentences, for a total effective sentence of life plus twenty-four years.

When reviewing a trial court's imposition of consecutive sentences, "the presumption of reasonableness applies," which gives "deference to the trial court's

exercise of its discretionary authority to impose consecutive sentences if it has provided reasons on the record establishing at least one of the seven grounds listed in Tennessee Code Annotated section 40-35-115(b)." State v. Pollard, 432 S.W.3d 851, 861 (Tenn. 2013). "Any one of [the] grounds [listed in section 40-35-115(b)] is a sufficient basis for the imposition of consecutive sentences." Id. at 862 (citing State v. Dickson, 413 S.W.3d 735 (Tenn. 2013)).

Here, the trial court concluded that the Defendant was a dangerous offender whose behavior indicated little or no regard for human life and no hesitation about committing a crime in which the risk to human life was high. See Tenn. Code Ann. § 40-35-115(b)(4). Before a trial court may impose consecutive sentences on the basis of the dangerous offender category, it must find "that an extended sentence is necessary to protect the public against further criminal conduct by the defendant and that the consecutive sentences . . . reasonably relate to the severity of the offenses committed." State v. Wilkerson, 905 S.W.2d 933, 939 (Tenn. 1995). The trial court must make specific findings about what "particular facts" show that the Wilkerson factors apply to the defendant. State v. Lane, 3 S.W.3d 456, 461 (Tenn. 1999).

The record belies the Defendant's claim that the trial court failed to make the necessary factual findings regarding the Wilkerson factors. The trial court found that consecutive sentencing was reasonably related to the severity of the offenses committed given that "this [was] a premeditated act involving a home invasion and a senseless shooting and killing." The trial court placed great importance on the fact that the Defendant had violated "the sanctity of the [victims'] home." The trial court also found that consecutive sentencing was necessary to protect the public from further criminal conduct by the Defendant, noting that there had been "multiple efforts to rehabilitate the [D]efendant as a juvenile, his long history of being a drug dealer, his history of being in a gang . . . it all adds up."

Having made the necessary factual findings, the trial court did not abuse its discretion by applying the dangerous offender category to impose partial consecutive sentences. The Defendant forced his way into the apartment of the unarmed victims, pointed a gun at them, and demanded money. The Defendant then shot Mr. Lopez as he went to check on Mr. Salas. The Defendant had been adjudicated delinquent as a juvenile for attempted robbery and "felony theft." The Defendant also admitted to a long history of drug use, to being a drug dealer, and to being affiliated with a gang. Additionally, the Defendant continued to maintain at the sentencing hearing that he did nothing wrong despite the overwhelming evidence of his guilt. Accordingly, we conclude that the trial court did not abuse its discretion in applying the dangerous offender category.

Regarding the Defendant's argument that partial consecutive sentencing was not appropriate because "[a]ll of the offenses charged . . . arose out of one set of circumstances," we note that under section 40-35-115 "consecutive sentences may be imposed any time [a] defendant has been convicted of more than one criminal offense." State v. Moore, 942 S.W.2d 570, 572 (Tenn. Crim. App. 1996). "The power of a trial judge to impose consecutive sentences ensures that defendants committing separate and distinct violations of the law receive separate and distinct punishments." State v. Malone, 928 S.W.2d 41, 44 (Tenn. Crim. App. 1995). The Defendant committed six distinct violations of the law, most of which were based on discrete acts or involved multiple victims. Accordingly, we conclude that the trial court did not abuse its discretion by imposing a total effective sentence of life plus twenty-four years.

## CONCLUSION

Upon consideration of the foregoing and the record as a whole, we vacate the Defendant's conviction for especially aggravated robbery and modify it to aggravated robbery. The case is remanded to the trial court for a new sentencing hearing on the modified conviction, entry of an amended judgment form reflecting the modification, and entry of a corrected judgment form in Count 1 reflecting that Count 2 was merged into Count 1. We affirm the judgments of the trial court in all other respects.

_____
D. KELLY THOMAS, JR., JUDGE